Patrick J. Potter, VSB No. 37966
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
1200 Seventeenth Street, NW
Washington, DC 20036
Tel (202) 663-8928
Email: patrick.potter@pillsburylaw.com

*Proposed Counsel for the Debtor and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

-------------------------------------------------------------

|  |  |
|---|---|
| In re: | ) ) ) | Chapter 11 |
| **INSIGNIA TECHNOLOGY SERVICES, LLC,** | | Case No. 19-50277 |
| Debtor.[1] | | |
| **INSIGNIA TECHNOLOGY SERVICES, LLC,** Plaintiff, | | Adv. Proc. No._____ |
| v. | | |
| **DAVID LA CLAIR,** Defendant. | | |

-------------------------------------------------------------

## COMPLAINT

Plaintiff Insignia Technology Services, LLC ("Insignia" or the "Company") hereby makes

the following allegations against defendant David La Clair ("Mr. La Clair").

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over this adversary proceeding pursuant

to 28 U.S.C. §§ 157 and 1334.

---

[1] The last four digits of Insignia's federal tax identification number are: 3701. The Debtor's
address is: 610 Thimble Shoals Boulevard, Building 6, Newport News, Virginia 23606.

2.      The Court possesses personal jurisdiction over Mr. La Clair, including (but not limited to) because (a) all or most of the acts and omissions giving rise to the causes of action in this complaint occurred in this District, (b) Mr. La Clair has regularly conducted business in this District, and (c) Mr. La Clair has availed himself of the U.S. District Court in this District.[2]

3.      This adversary proceeding is commenced pursuant to Rules 7001(7), (8), and (9) of the Federal Rules of Bankruptcy Procedure, sections 105, 502, 510, 1122, and 1126 of title 11 of the United States Code (the "Bankruptcy Code"), and section 2201 of title 28 of the United States Code.

4.      Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

5.      Insignia is a limited liability company organized and existing under the laws of Virginia.  Insignia's principal place of business is located at 610 Thimble Shoals Boulevard, Building 6, Newport News, Virginia 23606.  Frederick P. O'Brien ("Mr. O'Brien"), a United States Army veteran with over twenty years of military service is Insignia's manager, president, and chief executive officer ("CEO").  Mr. O'Brien is also Insignia's sole member through his ownership of 100% of Insignia's membership interests; though, for tax purposes, the Company is treated as a partnership, with Mr. La Clair constituting a 49% partner and Mr. O'Brien constituting a 51% partner.

6.      Insignia provides information technology services and solutions to the United States government, primarily to the Department of Veterans Affairs (the "VA").  Insignia provides

---

[2]  On January 15, 2019, Mr. La Clair filed a lawsuit against Insignia and Mr. O'Brien in the United States District Court for the Eastern District of Virginia under Case No. 4:19-cv-0006 (the "Litigation").  A copy of the complaint initiating the Litigation (ECF No. 1) (the "La Clair Complaint") is attached hereto as **Exhibit A**.

program management, software, system, and security engineering services for mission-critical enterprise services and solutions that support VA benefit programs for America's veterans. More on Insignia's business can be found on its website at www.insigniatechnology.com.

7.       Due to Mr. O'Brien's status as a service-disabled veteran,[3] Insignia is presently verified as a "Service-Disabled Veteran-Owned Small Business" or "SDVOSB" by the VA. The SDVOSB qualification allows Insignia to participate in the Small Business Administration's ("SBA") Service-Disabled Veteran-Owned Small Business Program and the VA's Veteran First Contracting Program[4], which are designed to implement the U.S. government's goal of awarding at least 3% of all federal contracting dollars to verified, qualified SDVOSBs. Insignia's status as an SDVOSB allows it to compete for this work and win contracts, including the VA T4NG and GSA VETS II Indefinite Delivery Indefinite Quantity ("IDIQ") contract vehicles (discussed further below).[5]

---

[3]  A service-disabled veteran is a veteran who possesses either a valid disability-rating letter issued by the VA, establishing a service-connected rating between 0 and 100 percent, or a valid disability determination from the Department of Defense or is registered in the Beneficiary Identification and Records Locator Subsystem maintained by the VA's Veterans Benefits Administration as a service-disabled veteran. 13 CFR part 125.11(definition of "service-disabled veteran").

[4]  Insignia qualifies for these programs because it is (a) "small" within the SBA's size standards; (b) 51% unconditionally and directly owned and controlled by a service-disabled veteran; and (c) managed, day-to-day by a service-disabled veteran who also makes long term decisions for the company.

[5]  IDIQ contracts are issued when the government cannot determine, above a specified minimum, the precise quantities services that the government will require during the contract period, typically a base amount of years with options for additional years. Importantly, multiple companies are typically awarded an IDIQ contract, and those companies awarded the IDIQ will then compete for actual work under specific task orders issued by the government against the IDIQ. Accordingly, while the IDIQ awards are important, the contracting entity does not actually receive funds under the contract until the government issues specific task orders under the IDIQ.

8.     All of Insignia's revenues come from federal contracts for SDVOSBs.  If Mr. O'Brien were to either leave or lose control of Insignia, the Company would lose its SDVOSB verification and the government likely would not exercise its option periods for Insignia's current contracts and task orders and would exercise its right to "off-ramp" (*i.e.*, terminate) Insignia from its existing IDIQs contracts, which would result in the Company losing all sources of revenue by the end of 2019.[6]  *See* 13 CFR part 125.13(i); *see also infra* Factual Allegations at V.A.

9.     Defendant Mr. La Clair is an individual, and upon information and belief, a resident of Florida.  Mr. La Clair is a former owner of 49% of Insignia's membership interests and Insignia's former president.  Mr. La Clair is still a partner in Insignia for tax purposes.

## STATEMENT OF THE CASE

10.     The Court is familiar with so-called "loan-to-own programs" where a lender will loan money secured by the borrower's business or property (*the lender's real target*), knowing there is a material risk of default; all with the intent of the lender exerting pressure on the borrower to the point of a voluntary or involuntary transfer of ownership of the business or property to the lender. While these programs are bad enough, at least they typically involve the lender actually advancing (*i.e.*, loaning) needed funds to the borrower.

11.     While similar to a loan-to-own program, the transaction before the Court (we call it an "LBO-to-own program") is even worse.  Here, though, Mr. La Clair, the individual "bought out" in 2015, never contributed or loaned any money to the Company.  Instead, he squeezed the

---

[6]  T4NG Contract § H.2 ("Any SDVOSB or VOSB contract holder that was not awarded in Step One must notify CVE/OSDBU with a copy to the contracting officer of any change in ownership or control of the company within 15 days of that change becoming final. If the Government elects to exercise the Off-Ramp, the Contractor will be removed from the program and thus will not be eligible to propose on any T4NG task order competitions.").  An excerpt of this section is attached hereto as **Exhibit B**.

Company's receivables, raided the Company's treasury (including $8 million in cash and $9 million in bank financing), and intentionally drove the Company deep into insolvency.

12.    But the piracy did not end there.  Mr. La Clair, knowing there was a high risk of default, caused the Company and Mr. O'Brien to sign instruments, including a $13.88 million promissory note from the Company and an equity pledge from Mr. O'Brien, all aimed at enabling Mr. La Clair to either (a) threaten to take over the Company and continue to squeeze out more concessions (tapping into the Company's and Mr. O'Brien's fears that with a change in control over the Company, all government-contracting work would be lost), or (b) synthetically take over the Company without any actual change in control (hoping the government does not notice), by sucking every post-expense dollar out of the Company in perpetuity.

13.    And, while difficult to imagine, to make matters worse, Mr. La Clair's LBO-to-own program was (and continues to be) launched against Mr. O'Brien, a service-disabled veteran who served in the United States Army for over twenty years.

14.    The subject transaction and Mr. La Clair's actions and intentions scream out for an equitable remedy.  Fortunately, this Court is a court of equity.  And, fortunately, bankruptcy and other laws arm the Court, the Company, and Mr. O'Brien with the tools needed to finally stop Mr. La Clair in his tracks; though Insignia is confident that Mr. La Clair will continue his takeover/shutdown campaign during the Company's chapter 11 case.  Based upon applicable law, Mr. La Clair's claim should be disallowed, and in the alternative, recharacterized as equity and subordinated; he should be stripped of any voting rights pursuant to the Bankruptcy Code's designation provision, and otherwise labeled and treated as the insider he is.  By these steps, the Company will be relieved of the Hobson's choice (which Mr. La Clair demonstrably seeks to

indefinitely perpetuate) of (a) shutting down and (b) giving in to Mr. La Clair's LBO-to-own strategy (which, too, would likely result in the Company shutting down).

## FACTUAL ALLEGATIONS

### I.   Factual Overview

15.    This adversary proceeding arises from Mr. La Clair's efforts to leverage (a) a $13.88 million promissory note (calling for semi-annual payments from the Company of roughly $2.7 million beginning January 2017, the "Note")[7] issued by Insignia in April 2015 for the redemption of his 49% interest in the company and (b) the $12.5 million in cash[8] (of which $9 million was financed through a bank loan) Insignia paid Mr. La Clair at the same time, into full control of the Company and to otherwise make Insignia (and Mr. O'Brien) his personal cash machine (the April 2015 transaction, pursuant to which Mr. La Clair intentionally rendered the Company balance sheet insolvent as of April 3, 2015, is referred to herein as the "La Clair LBO"). Mr. La Clair obtained all of these financial benefits without ever having previously contributed or loaned any funds to the Company.

16.    In 2016, several events largely outside of Insignia's control caused it to experience tremendous financial hardships.  Specifically, the government did not exercise option periods on

---

[7]  As explained below, per the Note's terms, the principal amount of the Note was reduced to $11,419,523 based on Insignia's 2016 revenues.  A copy of the Note is attached hereto as **Exhibit C**.

[8]  Actually, Mr. La Clair received cash totaling approximately $16.9 million at the April 3, 2015 La Clair LBO closing.  He demanded that Insignia distribute all excess cash (approximately, $8.9 million) to Insignia's interest holders (Messrs. La Clair and O'Brien), of which approximately $4.4 million was distributed to Mr. La Clair, and the balance to Mr. O'Brien. However, this cash depletion plus the $9 million bank loan placed such strain on Insignia's finances that Mr. O'Brien had to contribute $3.5 million of his $4.5 million distribution back to Insignia (which was immediately transferred to Mr. La Clair).  Thus, unlike Mr. La Clair (who never contributed money to the Company), Mr. O'Brien has contributed substantial cash to the Company.

two major contracts (CRM, VALU) and four other contracts under which Insignia was a prime

prior to 2016 (ACS, MVI, VHIC, MSAS) expired and were re-competed under an IDIQ which

Insignia could not bid as a prime contractor.   Collectively, these projects accounted for

approximately $30.5 million of 2016's forecasted revenue.   As a result, Insignia's 2016 revenue

plummeted by almost two-thirds; from $35.3 million in 2015 to $13.4 million.   This drop forced

Insignia to slash its workforce from over 150 employees in 2015 to 38 by July 2016.

17.      Although Insignia's revenue has begun to recover, it is nowhere near its 2015 highs;

*2018 revenues were over $15 million less than 2015*.   Furthermore, increased competition,

government contract consolidation, and an increase in the government's use of time and materials

contracts (vs. firm fixed price contracts, which carry higher risk, but can be more profitable) have

caused Insignia's profit margin to fall from approximately 28% in 2015 to less than 5% in 2018,

thus magnifying the effect of the decline in revenue on the Company's overall earnings.   As such,

even if Insignia's revenues were to return to 2015's levels today, the Company would only be

about one-sixth as profitable today as it was in 2015.

18.      The Note's payment obligations are so burdensome that Insignia has been unable

to make the $2.7 million semi-annual payments to Mr. La Clair.   Insignia's annual net income was

only $1.9 million in 2017 and $919,000 in 2018.   As such, even if Insignia flushed out every single

dollar of net income to Mr. La Clair over the past two years, it would have been almost $8 million

short[9] of the over $10 million in Note payments demanded by Mr. La Clair.   Based on Insignia's

current estimate, 2019 net income is likely to be only slightly above 2018.   By any metric, the

---

[9]   Before interest, which, according to the La Clair Complaint is accruing at $3,128.64 per day or
      $1,141,953.60 per year.   La Clair Complaint at ¶ 36.

amounts demanded by Mr. La Clair under the Note are unsustainable and must be restructured if Insignia is to continue as a going concern.

19.     As a result of Insignia's performance in 2016, Insignia informed Mr. La Clair that it was unable to make the first Note payment due January 15, 2017.  In April 2017, Insignia and Mr. La Clair attempted to negotiate a restructuring of the Note, but were not successful because Mr. La Clair demanded more, sooner: *i.e.*, (1) ***full, indeed accelerated,*** repayment of the Note by January 2019 (versus the Note's original maturity date of July 2019); (2) an increased interest rate of 7% (up from the original 5%); and (3) the option to convert $6 million of the Note's principle amount into 25% of Insignia's equity (exercisable at Mr. La Clair's sole discretion).  Mr. La Clair's then refusal to recognize the Company's financial straits (initiated by the insolvency caused by the La Clair LBO) and insistence on unreasonable restructuring terms provide evidence of Mr. La Clair's sustained intentions to either recover more than the Company's value or ensure its shutdown.

20.     To further his LBO-to-own program, in 2017, Mr. La Clair published "bid procedures" to auction "all right title and interest" to Mr. O'Brien's 49% (economically worthless due to Insignia's balance sheet insolvency) membership interest in Insignia.  While it might appear that Mr. La Clair's goal was to convey a 49% equity interest in the Company (whether to himself or someone else), this is highly suspect.  It is unlikely that Mr. La Clair and his legal counsel were unaware of Virginia Code section 13.1-1038, which states "[t]he only transferrable interest of a member in the limited liability company is the member's share of the profits and losses of the limited liability company and the member's rights to receive distributions."  Va. Code § 13.1-1038; *see also* Va. Code §§ 13.1-1039 and 13.1-1040.  This being the case, Mr. La Clair's feigned

foreclosure was nothing more than a tactical ruse to bully Mr. O'Brien into giving Mr. La Clair

more, sooner.  This is more evidence of Mr. La Clair's LBO-to-own strategy.

21.     Mr. O'Brien refused to be bullied.  Instead, he informed Mr. La Clair that if 49%

of Insignia's outstanding equity was taken from him and the Note remained outstanding, then

Insignia would not be viable.  Mr. O'Brien also cautioned that to protect the integrity of the

SDVOSB program,[10] Insignia would notify the VA of the change in ownership/control, which

would likely cause the VA to conduct a reverification audit that would result in Insignia no longer

being verified as a SDVOSB.  Mr. O'Brien further explained that the result of the foregoing would

make Insignia ineligible to compete for SDVOSB "set asides" (*see infra* at note 13) and lead to

the VA exercising its option to "off-ramp" (*i.e.*, terminate) Insignia from the T4NG IDIQ contract.

The auction was held on May 25, 2017 but ended without a sale of Mr. O'Brien's membership

interests encumbered by Mr. La Clair's lien.  While Mr. La Clair has blamed Mr. O'Brien for Mr.

La Clair's decision (with the aid of his legal counsel) to not bid and acquire the equity at

foreclosure, it is more likely that Mr. La Clair fully understood the import of Virginia Code

sections 13.1-1038-1040), and that he could not legally do so.

22.     In late 2018, Insignia and Mr. La Clair again began discussions regarding a

potential restructuring of the Note.  Insignia sent more financial statements to Mr. La Clair,

showing the Company had not recovered from the insolvency caused by the La Clair LBO.

---

[10] And as required by 38 CFR part 74.3(b) ("The participant must file an updated VA Form 0877
and supporting documentation identifying the new veteran owners or the new business interest
within 30 days of the change."); *see also* 38 CFR part 74.15(b) ("The participant must maintain
its eligibility during its tenure and must inform CVE of any changes that would affect its
eligibility within 30 days."); 38 CFR part 74.21(d) (permitting the VA to remove a SDVOSB's
verification for good cause, including failure to notify the VA of any changes in ownership
within 30 days or other changed circumstances, including its failure to maintain eligibility for
the program.).

Consistent with his original strategy of either (a) owning or controlling the Company's net cash flow or (b) killing the Company, Mr. La Clair refused to restructure the Note on any terms that would recognize the Company's (versus Mr. O'Brien's) value and permit the Company to continue to operate and grow.

23.     Instead, Mr. La Clair demanded that Insignia (a) turn over all cash and outstanding receivable proceeds that exceed current payables and six weeks of payroll and (b) make 5-years of monthly payments that (on a yearly basis) literally exceed the past two years of Insignia's net earnings combined, thus (1) leaving the Company with no cash to grow the business or able to withstand any future business downturns and (2) distorting the Company's (versus Mr. O'Brien's) value.  Mr. La Clair also demanded that Insignia grant him a security interest in (a) all of Insignia's assets and (b) 100% of Mr. O'Brien's membership interest.  Mr. La Clair also insisted on an additional payment equal to 20% of net proceeds upon a major capital or liquidity event, including financing, a sale of assets, or a whole or partial sale of Insignia's membership interests.  This is all classic loan-to-own (*in this case LBO-to-own*) strategy.

24.     In sum, Mr. La Clair has demanded that Mr. O'Brien—the individual solely responsible for Insignia's SDVOSB certification that allows the Company to generate all of its revenue—work during the final years of his career solely for Mr. La Clair's benefit, and if Mr. O'Brien's efforts are ultimately rewarded with a sale of his equity, that Mr. La Clair also share in the reward of those efforts (in addition to the over $28 million in cash[11] that Mr. La Clair would have sucked out of the Company).  Indeed, Mr. La Clair's demands are so onerous that if the Company were to accede to them, it would seriously jeopardize its status as a SDVOSB, and

---

[11] This figure is comprised of the (a) the nearly $17 million Mr. La Clair pulled out of the Company via the La Clair LBO and (b) $11.4 million principle amount of the Note (if paid).

therefore, its ability to operate as a going concern.  As such, Mr. La Clair has taken the position

that if he cannot have every dollar of earnings generated by Insignia, then he would rather see the

Company destroyed.

25.     The Company refused to jeopardize its SDVOSB status (indeed, *its viability*) by

accepting Mr. La Clair's demands.  Mr. La Clair responded by filing suit against Insignia and Mr.

O'Brien on January 15, 2019 in the United States District Court for the Eastern District of Virginia;

again, seeking more money, sooner or to take over (and thus, destroy) the Company.

26.      In an effort to definitively right-size its balance sheet in a way that is consistent

with the value of the bankruptcy estate's interest in the Company (which does not include Mr.

O'Brien, as he is not property of the estate), Insignia filed its chapter 11 petition.  Nevertheless,

Insignia is confident that Mr. La Clair will put his takeover/shutdown strategy on full display for

the Court and creditors to see.[12]

27.     As such, by this adversary proceeding, Insignia seeks to (a) prevent Mr. La Clair

from actually or effectively taking over or (if he does not get his way) destroying the Company,

and to remedy the harm suffered by the Company from the insolvency-inducing La Clair LBO,

(b) restore the Company to solvency, and (c) ensure that the Company can continue to fulfill its

mission to serve the needs of the VA.

---

[12] Indeed, literally as the Company was putting the finishing touches on its chapter 11 filing and this Complaint, on February 28, 2019 (yesterday), Mr. La Clair engaged in a series of corporate gymnastics designed not only to perfect his takeover/shutdown strategy, but to try to prevent the Company from seeking chapter 11 relief altogether.  More about this in Part V.D., below, and (no doubt) during the course of hearings to come.

## II.   Insignia's Background

### A.     Insignia's Founding and Start Up

28.     On or about August 1, 2006, Mr. La Clair founded Insignia as a sole proprietorship, and Insignia received its first subcontract from General Dynamics.  On August 24, 2007, Mr. La Clair converted Insignia into a Virginia limited liability company.

29.     In December of 2006, Congress enacted the Veterans Benefits, Health Care, and Information Technology Act of 2006, P.L. 109-461 (the "2006 Act"), which, among other things, requires the Secretary of Veterans Affairs to set more specific annual goals that encourage contracting with service-disabled veteran-owned small businesses.   2006 Act §§ 502, 503, (codified, as amended, at 38 U.S.C. §§ 8127, 8128).

30.     Previously (around October 2005), Mr. La Clair and Mr. O'Brien met while working in the office of the chief information officer for the United States Army Training and Doctrine Command, headquartered at Fort Eustis, Virginia.   Mr. La Clair was working as a contractor for Lockheed Martin and Mr. O'Brien was on his last assignment before his retirement from the Army.  As Mr. O'Brien's 2007 retirement neared, he and Mr. La Clair began discussions about forming an information technology services company that would compete for SDVOSB

"set-aside" contracts[13] under the so-called "Vets First Contracting Program," which was created

under the 2006 Act and expanded the SDVOSB contracting program for VA procurements.[14]

31.     On January 1, 2008, Mr. La Clair and Mr. O'Brien entered into an operating

agreement for Insignia that provided Mr. O'Brien with 51% ownership interest in the Company

and Mr. La Clair (a non-veteran) with a 49% ownership interest.  Neither then, nor subsequently,

did Mr. La Clair contribute any cash to capitalize the Company.  While Mr. O'Brien also did not

provide an initial cash contribution, he contributed $3.5 million to the Company in response to the

insolvency created by the La Clair LBO.

32.     On February 28, 2008, Mr. O'Brien received his disability rating from the VA,

which then allowed Insignia to seek verification from the VA's Center for Verification and

Evaluation ("CVE") as a SDVOSB.  On September 10, 2009, the CVE notified Insignia that it had

been verified as a SDVOSB and was eligible to participate in the VA's Veterans First Contracting

Program opportunities.

33.     On September 28, 2010, Insignia was awarded its first SDVOSB set aside IDIQ

contract with a ceiling of $4.9 million.

---

[13] As noted, the federal government has a goal of awarding at least 3% of all federal contracting
dollars to verified, qualified SDVOSBs.  In addition, the VA has a 10% department-wide goal.
The government's primary mechanism for achieving these goals is known as a "set aside"
contract, which, in the case of SDVOSBs, restricts the businesses eligible to compete for (and
receive awards under) the contract to government-verified SDVOSBs.  This ensures (1) a level
playing field for verified SDVOSBs to compete for work against one another rather than having
to compete against much larger non-SDVOSB businesses, thereby increasing any given
SDVOSB's changes for success and (2) that the government's contracting dollars "set aside" for
the contract will actually go to verified, qualified SDVOSBs, in support of the VA's 10% goal.

[14] Additional information about the Vets First Contracting Program and its applicable regulations
are available at https://www.va.gov/osdbu/faqs/109461.asp.

B.    **Insignia Grows; Tragedy Occurs; the Principals' Visions for the Company's Future to Diverge**

34.    Less than a year after being awarded its first IDIQ, Insignia partnered with the VA and secured one of five awards on the Veterans Relationship Management ("VRM") IDIQ, which had a five-year period of performance (June 24, 2011 through June 22, 2016) and a $480 million contract ceiling.    Ultimately, Insignia won seventeen (17) task orders under the contract representing a total of approximately $92 million in revenue over that five-year period.  By 2013, Insignia was experiencing tremendous growth.  Its 2013 revenues were $15.87 million (net income $5.47 million), a 76% increase from 2012, which was followed in 2014 with 97% increase in revenues to $31.29 million (net income $12.22 million).

35.    On June 11, 2011, Mr. La Clair and Jacquelynn Schwartz ("Mrs. La Clair") were married at Mr. O'Brien's home.  Mrs. La Clair was also an employee of Insignia and served in multiple capacities, including, office manager, accounting bookkeeper, payroll administrator, and the Company's Facility Security Officer, responsible for employee onboarding and background checks.  A mere six weeks later, Mrs. La Clair tragically passed away on July 18, 2011.

36.    Mrs. La Clair's passing had a profound effect on Mr. La Clair.  Mr. O'Brien told Mr. La Clair that he would take care of the Company while Mr. La Clair was grieving, and everyone would welcome him back when he was ready.  Mr. La Clair initially took off approximately twelve (12) months before returning to work in the fall of 2012, although only sporadically, as he continued to take unannounced leave for weeks at a time.

37.    Upon Mr. La Clair's return to work, Mr. La Clair became disengaged from Insignia, which impacted his management actions and decisions and caused problems for the Company's operations.  When Mr. La Clair was not on an unannounced leave (which lasted up to six weeks at a time), he would often show up late for meetings, and when he did arrive at the meetings, he was

14

usually unprepared.  In addition, Mr. La Clair was absent during Insignia's critical bid and proposal season in late August 2013.  Mr. La Clair's lapses in judgment and withdrawal from the day-to-day operations of the business began to have large repercussions for Insignia.

38.     As Insignia's president, Mr. La Clair was responsible for oversight of a portfolio of active contracts/task orders, including one to develop and deploy a software system to support the VA's VetSuccess program, which assists veterans in their transition from military life to college life.  Because that project was in Mr. La Clair's portfolio, he was responsible for staffing, client relations, and the timely development and deployment of software releases.  On September 27, 2013, the VA's contracting officer for the project contacted Mr. O'Brien directly to inform him of service delivery and software problems with the system.  These problems threatened Insignia's ability to deploy the system by the deadline specified in the contract, which, if missed, could cost the company approximately $800,000.  Mr. O'Brien immediately investigated the matter and learned that Mr. La Clair had failed to develop a detailed deployment plan or coordinate follow-up activities.  In addition, Mr. O'Brien found that the project manager Mr. La Clair had assigned (and hired) to the project was inexperienced and unequipped to manage the project.  After discovering these issues, Mr. O'Brien demanded that Mr. La Clair reassign the project manager or terminate his employment.

39.     Separately, in November 2013, Insignia was notified by the State of California that in 2010, Mr. La Clair had paid employees for after-hours work in violation of California labor laws.  Mr. La Clair was on a three-week absence at the time Insignia was notified.  As a result, Mr. O'Brien had to address the issue, which resulted in Insignia paying a fine for the improper payments authorized by Mr. La Clair.

40.     Mr. La Clair also caused Insignia to bid on contracts for technically complex projects that were beyond its core competencies, which, due to their fixed-price nature, resulted in substantial losses for Insignia.  For example, Access Control Services ("ACS") was a VA initiative to provide a single-sign-on to dozens of legacy systems for the 300+ thousand VA employees. The project was so complex and ambitious that Deloitte and Hewlett Packard, both of whom had previously worked on the project, declined to compete for future work on the project.  Mr. La Clair and his brother, Charles "Chip" La Clair (who was also an Insignia employee at the time), decided to bid for the work, which was bid as a firm-fixed price award (which means that Insignia would only get paid if the VA accepted the work).  The work required under ACS was beyond Insignia's ability to execute in a profitable manner.  By the end of Insignia's work on ACS, the Company had lost over $1 million on the project due to costs exceeding revenues.

41.     Mr. La Clair's absences, unpreparedness, failures to manage and bidding on extremely risky contracts began to damage employee morale, with many of Insignia's senior employees refusing to work with Mr. La Clair.  The net effect of the foregoing was that Mr. O'Brien was not only forced to "pick up the slack" for Mr. La Clair in managing Insignia on a day-to-day basis, he was required to devote substantial time and energy to cleaning up problems caused by Mr. La Clair.

42.     In addition to the issues with Mr. La Clair's management (or lack thereof), Mr. La Clair and Mr. O'Brien began to have different priorities and visions for the future of Insignia.  On September 11, 2013, Mr. La Clair and Mr. O'Brien held a meeting to discuss their respective differences in personal goals, philosophies regarding the management of the Company and the level of involvement they were willing to devote to Insignia, especially considering the impacts the foregoing issues were having on the Company's performance and employee morale.  At this

16

meeting, Mr. La Clair indicated that he would prefer to sell the Company, but both parties agreed to evaluate their respective options and visions for the future and settle on a path forward at a future date.

## III.    Mr. La Clair's Exit from Insignia

### A.    Insignia Explores its Options to Sell

43.    In October 2013, Insignia retained Boxwood Partners LLC ("Boxwood") to conduct a valuation of the Company.  On December 5, 2013, Mr. La Clair and Mr. O'Brien met with Boxwood to hear the results of the valuation.  Upon reviewing the valuation, it became clear that the valuation was high and unreliable because Boxwood did not consider the inherent uncertainties associated with government contracting (including federal appropriation issues, discretionary option periods, mandatory source selection procedures, imminent bid protest challenges, etc.) or the unique aspects of Insignia's business (including its SDVOSB status – the driver of the Company's revenues – and the fact that Insignia is extremely dependent on a single government client, the VA).  Most importantly, the valuation failed to make any discount for the extremely limited market for Insignia's equity, if any, due to its SDVOSB status.  Boxwood, without considering these factors, indicated that its estimate of Insignia's entire value was $25 to $32 million (based on a combination discounted-cash-flow and leveraged-buyout analysis).

44.    Mr. La Clair and Mr. O'Brien met again on December 20, 2013 to discuss Insignia's future.  At the meeting, Mr. La Clair made it clear that he wanted to pursue a 100% sale of the Company while it was experiencing all-time high revenues and earnings (all of which were attributable to Mr. O'Brien's status as a service-disabled veteran).  Mr. La Clair also stated that *he was tired of government contracting and its acquisition rules and compliance and expressed his belief that Insignia was continuing to gamble in the environment (presumably on the risky contracts that Mr. La Clair bid on) and that it was time to "cash out" while Insignia's value was*

17

*the highest that it had been and would ever be.* Although a sale was not Mr. O'Brien's preferred path for Insignia, he agreed that the Company should explore all its potential options, especially considering Mr. La Clair's withdrawal from the Company and the impact it was having on the Company's service delivery performance and employee morale.

45.   In June 2014, Insignia retained KippsDeSanto ("Kipps"), an investment bank focused on companies in the technology solutions and aerospace/defense sectors, to evaluate the Company's strategic options, including a 100% sale of the Company as requested by Mr. La Clair. Kipps then spent the next several months examining Insignia's financial records, contracts, and other relevant records, as well as, Insignia's competitive landscape.  After completing its analysis, Kipps then contacted several strategic investors regarding their interest in acquiring or investing in Insignia.

46.   Due to the limited market for SDVOSB equity, Kipps, unsurprisingly, did not receive any offers for a 100% acquisition of Insignia.  Although Kipps received several proposals for a partial investment that would allow Insignia to purchase Mr. La Clair's membership interests at his demanded price of $25 million (which in and of itself was absurd considering that it was almost equal to the low end of Boxwood inflated valuation of the *entire company* completed a year earlier) all the partial-investment proposals required Insignia to become highly leveraged, and thus, were not viable.  Indeed, given the extreme financial distress Insignia endured in 2016, it is very likely that Insignia would have defaulted under any of these proposals and would no longer exist today.

**B.    Mr. La Clair Devises His Golden Parachute**

47.   Undeterred by the lack of interest in an acquisition of Insignia by the market (*at the peak of its value*), Mr. La Clair forged ahead with his plan to "cash out" at Insignia's peak.  Mr. La Clair initiated discussions with Bank of America regarding a loan to the Company that could

be used to repurchase Mr. La Clair's membership interests.  As part of these discussions, Bank of

America retained Cherry Bekaert LLP ("Cherry") to conduct a valuation of Mr. La Clair's 49%

minority interest in Insignia.

48.    On February 9, 2015, Cherry presented the results of its valuation to Insignia and

calculated that Mr. La Clair's 49% interest in Insignia was worth approximately $24.11 million.[15]

Cherry valued 100% of the Company at approximately $64.75 million—nearly double the high

value estimated by Boxwood (which, as discussed, was inflated and overly optimistic).

49.    As with the Boxwood valuation, the Cherry valuation too was inflated and

unreliable because it failed to make any discounts for the inherent uncertainty in government

contracting, the extremely limited market for Insignia's services, and the fact that essentially all of

Insignia's revenues were tied to Mr. O'Brien's status as a service-disabled veteran.[16]  Finally, the

Cherry valuation assumed 2016 revenues of $38 million (versus actual of $13.4 million) and 2017

revenues of $39.1 million (versus actual of $17.5 million), thus resulting in a substantially higher

valuation than was actually the case.

50.    Indeed, Bank of America apparently viewed the valuation as "optimistic" (if not

excessively high), considering that it was willing to loan the Company (then worth supposedly

---

[15] Discounting for Mr. La Clair's minority interest appears to be the only factor that Cherry discounted for in the valuation.  The Cherry valuation used the three following valuation methods (with differing weights): discounted cash flow (60% weight); guideline public company method (30% weight); and guideline transaction method (Pratt's Stats) (10%) weight.

[16] The Cherry valuation was also unreliable because the public companies used were orders of magnitude larger than Insignia and thus not nearly as reliant on a single revenue stream and only one of the thirteen companies appears to be a provider of information technology services to the federal government, and thus, the remaining companies likewise are not as dependent on a single revenue stream like Insignia.  Notably, even the inflated Cherry valuation did not value Mr. La Clair's 49% membership interest as highly as he demanded during the discussions with Kipps.

$64.75 million) only $9 million (a loan-to-value ratio of approximately 14%) to purchase Mr. La

Clair's membership interests.

### C.   Mr. La Clair Demands Redemption of his Membership Interests and Depletes Insignia's Capital — the La Clair LBO

51.    While Mr. La Clair was devising a golden parachute for his exit from Insignia, Mr.

O'Brien was busy running the 180+ employee Company, ensuring service delivery for multiple,

complex mission-critical projects, and trying to ensure Insignia's future by bidding on future work,

such as the T4NG IDIQ bid that the Company submitted on December 12, 2014.

52.    After spending several months crafting his exit, Mr. La Clair completed his plan

that allowed him to extract $26.38 million from Insignia for his 49% membership interest in

Insignia (over $2.27 million more than Cherry's inflated valuation).  On April 3, 2015, Insignia

and Mr. La Clair executed a Membership Interest Redemption Agreement (the "Redemption

Agreement"), a copy of which is attached hereto as **Exhibit D**.  The Redemption Agreement

provided for Insignia's redemption of Mr. La Clair's membership interest in exchange for $26.38

million payable as follows: (1) an immediate cash payment of $12.5 million and (2) the Note in

the amount of $13.88 million.  The Note was not secured by Insignia, but rather was secured by a

pledge of 49% of Mr. O'Brien's membership interests in Insignia, which was memorialized in a

Pledge and Security Agreement executed by Mr. O'Brien (the "Pledge"), a copy of which is

attached hereto as **Exhibit E**.

53.    The Note included a provision that would increase or decrease the principal amount

by 10% of the difference between Insignia's actual revenues in 2016 and a target revenue of $38

million up to a maximum of $3.0 million.  As noted, Insignia's 2016 revenues were $13.40 million

(62% lower than in 2015).  Accordingly, the principal amount under the Note was reduced by

approximately $2.46 million to $11,419,523.

54.    As of April 3, 2015, Insignia had $12,031,487 in cash on hand, which was higher than normal because Mr. La Clair had demanded that Insignia accelerate the collection of any outstanding receivables.  Mr. La Clair then demanded that Insignia distribute—outside of the ordinary course of business—all cash on hand (except for amounts necessary to pay the next three payrolls) to the equity owners (Messrs. La Clair and O'Brien) prior to effectuating the Redemption Agreement, thus depleting Insignia's capital and leaving it with minimal reserves.

55.    Based on Mr. La Clair's demands, "excess" cash was calculated to be $8,896,610.85, of which $4,537,272 was allocated to Mr. O'Brien and $4,359,339 was allocated to Mr. La Clair based on their respective membership interests in the Company.  Indeed, Mr. La Clair's demands depleted Insignia's capital to such an extent that Mr. O'Brien was required to contribute $3,500,000 million of his $4,537,272 distribution back into the Company.  That amount was combined with $9 million in proceeds of a loan from Bank of America to pay the $12.5 million up-front cash payment to Mr. La Clair.  Accordingly, upon closing of the La Clair LBO, Mr. La Clair extracted approximately $30.74 million in total consideration for his 49% interest consisting of (1) wire transfers totaling $16.86 million and (2) the Note in the amount of $13.88 million; and he really did not even give up his 49% interest.  Immediately following the La Clair LBO, Mr. La Clair and his brother exited Insignia's headquarters without a goodbye or word of thanks to the employees who generated the value Mr. La Clair had just received.  Nor did Insignia's employees inquire as to their departure.

## IV.    Insignia Post-Buyout

### A.    Insignia's Revenues Plummet

56.    In 2015, Insignia had twenty-six (26) separate contract engagements and 184 hardworking and dedicated employees.  By the first quarter of 2016, however, Insignia's was down to only nine (9) engagements.  The drastic drop in engagements was the result of a confluence of

factors outside of Insignia's control that Mr. O'Brien had specifically warned Mr. La Clair could

occur in a February 2015 email sent in the lead up to the La Clair LBO.[17]   For example, Insignia

lost at least two contracts (CRM, VALU) because the government declined to exercise the option

periods (presumably due to a change in requirements or lack of funding).   Another one of Insignia's

contracts at nearby Fort Eustis was re-competed as an "8(a) small disadvantaged business" set-

aside, so Insignia could not compete for the work.   Three other contracts, MVI, VHIC, and ACS,

were re-competed under an IDIQ contract known as "T4" for which Insignia was not a prime

contractor (so it could not bid).   Insignia expected to be selected as a prime contractor on T4's

replacement, T4NG, but that selection process was delayed because there were over 450 vendors

competing to be selected on that contract.   Insignia was notified on March 7, 2016 that it was *not*

one of the initial twenty-eight (28) prime awardees on T4NG.   Finally, the five-year term of

Insignia's largest IDIQ, VRM, ended in June 2016, thereby eliminating the source of millions in

task orders.

57.    By the third quarter of 2016, Insignia was down to five (5) engagements.   To

survive this substantial loss of work, Insignia cut costs, paid down debt, and unfortunately, reduced

the size of its workforce.   By July 2016, Insignia was down to 38 employees, a loss of 146

employees from 2015's high of 184 employees.   July 2016, however, would prove to be the low

point in Insignia's decline.   Mr. O'Brien could have thrown in the towel, put Insignia in to a chapter

7 (thereby discharging all debts, including the debt to Mr. La Clair under the Note), and either

retired or started over in some other fashion.   Instead, he persisted.

---

[17] In that email, Mr. O'Brien specifically warned Mr. La Clair that there was substantial risk to
achieving 2016's revenue targets, including approximately $21 million in project re-competes
and new work that would have to be won.   A copy of Mr. O'Brien's email warning and Mr. La
Clair's subsequent dismissal of the warning is attached hereto as **<u>Exhibit F</u>**.

58.    At all relevant times, Mr. La Clair was well-aware of Insignia's financial difficulties.  As Insignia's president at the time, he was clearly aware that the La Clair LBO—which added $22.88 million[18] in liabilities to Insignia's balance sheet—would render Insignia balance sheet insolvent.   Moreover, Mr. La Clair was well aware of the possibility that the Company would be unable to pay the Note due to the risks the Company faced in 2016 as outlined by Mr. O'Brien prior to the La Clair LBO.   Between April 2015 and February 2017, Insignia provided its financial statements to Mr. La Clair (each showing Insignia's insolvency) on at least five separate occasions.[19]   Because he knowingly drove the Company into insolvency via the La Clair LBO with full knowledge of the risks inherent to the collectability on the Note if Mr. O'Brien's warnings came to fruition (which they did), it is not surprising that Mr. La Clair never complained about the Company's persistent (year-after-year) state of insolvency (until his feigned surprise of insolvency in the 2019 La Clair Complaint).

**B.    Insignia 2.0**

59.    On August 2, 2016, the VA notified Insignia that it had been selected for the T4NG IDIQ and would now be eligible to compete for task orders under the contract.  Due to the prior layoffs, Insignia did not have a business development team to compete for task orders under T4NG (and lacked the working capital to make the necessary investments to build one), so Mr. O'Brien and a team of engineers provided customer-facing services during the day and worked on business development activities after hours.  These efforts paid off with Insignia winning three opportunities during the fourth quarter of 2016.

---

[18] $9.0 million from the Bank of America loan and $13.88 million from the Note.

[19] Insignia's controller sent financial statements to Mr. La Clair on the following dates: August 25, 2015; February 16, 2016; April 15, 2016; January 31, 2017; February 15, 2017.  Upon information and belief, Insignia's controller also sent Insignia's financial statements to Mr. La Clair on April 27, 2016 and August 15, 2016.

60.    Despite these successes, Insignia still faced substantial challenges and remained worse off financially than in 2015.  Although Insignia was able to make its final payment on the $9 million Bank of America loan from the La Clair LBO on September 24, 2016, it was unable to meet the financial covenants required under a separate line of credit with the bank, resulting in a December 9, 2016 default notice.

61.    On January 6, 2017, Insignia notified Mr. La Clair that it was unable to make the upcoming Note payment of $2,694,053 due on January 15, 2017.  Mr. La Clair's counsel responded on January 26, 2017 and informed Insignia that it was in default under the Note and default interest of 10% per annum began accruing as of March 31, 2016.

62.    Insignia's revenue dropped by over 60% between 2015 and 2016.  Although Insignia has begun to recover, the Company's 2018 revenues are approximately 55% of their 2015 levels and its 2018 profit margin[20] (4.71%) is approximately one-sixth of 2015's profit margin (28.22%).  Finally, while the Company remains balance sheet insolvent as a result of the La Clair LBO, under Mr. O'Brien's command, the Company has reduced its insolvency from a negative $12.30 million at the end of 2015 to a negative $9.41 million at the end of 2018.  A chart showing the Company's financial decline and partial recovery is below.

| ($ in millions) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Revenue | $31.29 | $35.33 | $13.40 | $17.49 | $19.49 |
| % Change from Prior Year | n/a | 12.92% | -62.07% | 30.52% | 11.44% |
| Net Income | $12.22 | $9.97 | $2.52 | $1.98 | $0.92 |

---

[20] Calculated as: Net Income / Revenue = Profit Margin

| **Balance Sheet Solvency (Insolvency)**[21] | $11.68 | ($12.30) | ($10.65) | ($9.62) | ($9.41) |
|---|---|---|---|---|---|

63.    To this day Mr. La Clair continues to be the sole cause of the Company's insolvency.  The Company is cash-flow insolvent because it is not generating sufficient net income to make the scheduled payments under the Note.  And, the Company is balance-sheet insolvent because its $5.89 million in assets is barely half of the current principal amount of the $11.42 million Note.

64.    Insignia does not include its awarded contracts as assets on its balance sheet because of their inherent uncertainty based on the government's broad discretion to execute or not execute option periods, optional tasks, or for termination at the government's convenience.  In addition, the government reserves the right to "off-ramp" (*i.e.*, terminate) a SDVOSB from the T4NG or VETS II IDIQ umbrella contracts (among other reasons).  For example, Insignia's largest IDIQ, the T4NG IDIQ permits the government "in its sole discretion" to remove a SDVOSB from the program (*i.e.*, eliminating its ability to compete for future task orders) if a number of events occur, including if there is "any change in ownership or control," and requires such SDVOSB to notify the VA's CVE and the appropriate contracting officer within thirty days of such an event.  T4NG § H.2 (*see* Exhibit B hereto); 38 CFR part 74.3(b).

---

[21] As of December 31.  For the avoidance of doubt, Insignia was balance sheet solvent immediately prior to the La Clair LBO on April 3, 2015.

V.    **Mr. La Clair's Refusals to Restructure the Note Based on Insignia's New Financial Realities and Attempts to Seize Control of the Company**

A.    **Mr. La Clair Threatens to Foreclose on Mr. O'Brien's Membership Interests**

65.    In April 2017, Mr. La Clair and Insignia began negotiations regarding how to restructure the Note given the Company's financial difficulties.  Mr. La Clair continued to reveal his intentions.

66.    Mr. La Clair was no longer content to merely receive full payment of the Note with interest.  Instead, Mr. La Clair now wanted 25% of Insignia's equity in exchange for a $6 million reduction to the Note.  Thus (despite a Company insolvency level that was worse than that of which he now complains), Mr. La Clair himself valued 100% of Insignia's April 2017 equity at $24 million (*i.e.*, 25% = $6 million → 100% = $24 million).  Notably, this is *after* (a) the nearly $17 million in cash he took out in 2015, which alone rendered the Company insolvent (and the equity valueless); (b) the presumed payment of the Note's remaining balance after the conversion (which would have been approximately $5 million); and (c) all of the problems that plagued the Company in 2016 (which he was warned could occur).  Mr. La Clair gave Insignia 48 hours to agree to his demands or he would purportedly exercise his option to foreclose on 49% of Mr. O'Brien's membership interests in the Company.  Insignia did not respond to Mr. La Clair's demand.

67.    On April 27, 2017, Mr. La Clair's counsel issued a notice of auction purporting to schedule a public auction on May 25, 2017 of "all right title and interest" in 49% of Mr. O'Brien's equity interest in Insignia.

68.    If Mr. La Clair had become the owner of 49% of the equity in Insignia, he would *not* have returned the nearly $17 million in cash he received from the La Clair LBO, nor would he have forgiven his more than $11.4 million Note (except to the extent of any value attributed to the 49% equity in the insolvent Company).  So, in addition to potentially pulling out more than $28

26

Case 19-50277-SCS   Doc 4   Filed 03/02/19   Entered 03/02/19 19:00:50   Desc Main
Document      Page 27 of 48


million from the Company (cash plus Note), Mr. La Clair would have stood to indefinitely recover 49% of all upside that Mr. O'Brien might create in the future for the Company.  This would all come at the expense of Mr. O'Brien, who is single-handedly responsible for Insignia's (a) eligibility for the contracts that provide all its revenue and (b) reducing its balance sheet insolvency caused by the La Clair LBO.  Indeed, it is difficult to imagine Mr. O'Brien electing to stay at Insignia as Mr. La Clair's indentured servant under these circumstances.

69.     Insignia's counsel responded via letter on May 3, 2017 (a copy of which is attached hereto as **Exhibit G**), requesting a copy of the auction's bidding procedures and advising that upon completion of the auction, Insignia would inform the VA of the change in ownership (as required by 38 CFR part 74.3(b)), which would cause a review of Insignia's verification as a SDVOSB. Given the tremendous influence Mr. La Clair would exert on the Company if he were its largest creditor and owner of 49% of its membership interests, and taking into consideration Mr. La Clair's bullying tactics, Insignia's counsel also advised that the Company was evaluating whether it would still qualify as a SDVOSB.[22]  Insignia's counsel cautioned that disqualification as a SDVOSB

---

[22] Indeed, if Mr. La Clair held both $11 plus million in debt and 49% of the equity (conditions that did *not* exist pre La Clair LBO), a presumption would arise that Insignia was under non-service disabled veteran control.  *See* 13 CFR part 125.13(i)(5), (7).  Specifically, those provisions provide:    "**(i)  Control  by  non-service-disabled  veterans.**  Non-service-disabled veteran individuals or entities may not control the firm.  There is a rebuttable presumption that non-service-disabled veteran individuals or entities control or have the power to control a firm in any of the following circumstances, which are illustrative only and not inclusive:

(5) *A non-service-disabled veteran individual or entity, having an equity interest in the concern, provides critical financial or bonding support*.

(7) *Business relationships exist with non-service-disabled veteran individuals or entities which cause such dependence that the applicant or concern cannot exercise independent business judgment without great economic risk*."

These regulations make clear that Mr. O'Brien's concern about losing qualified veteran status due to the dual roles (largest creditor and 49% ownership), coupled with his aggressive tactics, was legitimate, and not a threat to sabotage the Company, as Mr. La Clair would like to argue.

27

would have an immediate detrimental effect on Insignia and result in the Company being ineligible for future task orders, potentially losing option periods on current task orders, and evaluating whether it would remain viable as a going concern.

70.     Neither Mr. La Clair nor his counsel responded to the May 3rd communication, so to negotiate a business resolution, Mr. O'Brien wrote via email to Mr. La Clair on May 24, 2017 (the "May 24 Email") with proposed revisions to the Note, and informed Mr. La Clair that Insignia would not agree to an equity conversion.  A copy of the May 24 Email is attached hereto as **Exhibit H**.  Again, consistent with 13 CFR part 125.13(i)(5) and (7),[23] Mr. O'Brien emphasized that (a) Mr. La Clair's acts could result in a presumption that Insignia was under non-service-disabled-veteran control and (b) Mr. O'Brien would not allow such a presumption to damage his or Insignia's integrity. *See* May 24 Email.

71.     To be clear, if a presumption were to arise that Insignia were under Mr. La Clair's control, then the VA could conclude that such a presumption constitutes "good cause" for the VA to cancel Insignia's verified status as a SDVOSB.[24]  Mr. La Clair was well aware of this, which (like his feigned threat to "foreclose" on "all right title and interest" in 49% of the Company's

---

[23] 38 CFR part 74.4 makes 13 CFR part 125 applicable to the VA's CVE, the entity responsible for Insignia's verification as a SDVOSB.

[24] 38 CFR part 74.21 permits the VA's Center for Verification and Evaluation to cancel an entity's verified status as a SDVOSB for "good cause," which, in relevant part, include:

(2) Failure by the participant to maintain its eligibility for program participation.

(3) Failure by the participant for any reason, including the death of an individual upon whom eligibility was based, to maintain ownership, management, and control by veterans, service-disabled veterans, or surviving spouses.

(4) Failure by the concern to disclose to CVE the extent to which non-veteran persons or firms participate in the management of the participant.

38 CFR part 74.21(d)(2)-(4).

equity), further demonstrates his bully tactics aimed at either squeezing the excess cash from the Company in perpetuity or shutting it down.

72.    In addition, Mr. O'Brien told Mr. La Clair that he would inform the VA of the change in ownership (*as he is required to do under applicable regulations*[25]), which would trigger a reverification of its status as a SDVOSB.  *Id.*

73.    Mr. O'Brien also indicated that, pending reverification, Insignia would withdraw any pending bids and suspend the issuance of any new bids in response to solicitations set-aside for SDVOSB because it could not know whether the VA would reverify it as a SDVOSB.  *Id.*

74.    Mr. O'Brien also outlined the likely consequences of a reverification, which included Insignia's removal from the T4NG IDIQ contract and insolvency of the company.  *Id.*

75.    Finally, Mr. O'Brien informed Mr. La Clair that it simply was not worth it for him to go through the reverification process, and instead, he would likely wind down the Company and retire, as was (and is) his legal right.  *Id.*

76.    On May 25, 2017, Mr. La Clair and Mr. O'Brien were both present at the so-called equity auction;[26] but, Mr. La Clair's bluff had been called by Mr. O'Brien, and Mr. La Clair declined to proceed, instead cancelling the auction.

---

[25] Pursuant to 38 CFR part 74.3(b), SDVOSB's are required to report any change in ownership to the VA within 30 days.  Failure to report any change in ownership within 30 days constitutes "good cause" for removal of an entity's verified status.  38 CFR part 74.21(d)(7).  Importantly, VA Form 0877 (the required form to submit any change in ownership) contains an affirmation that the individual signing the form has "read and understand the language in 38 CFR Part 74 and that the business is controlled by individuals eligible to participate in the Veteran First program if I am claiming SDVOSB status." The form also provides that all statements must be "true, correct, complete, and made in good faith," and warns that any misrepresentations regarding "SDVOSB eligibility may result in action taken by VA officials to debar the business concern for a period not to exceed 5 years from contracting with VA as a prime contractor or subcontractor."

[26] Insignia's controller, Heather Growchowski, also attended the auction.

77.     There were no communications between Mr. La Clair and Insignia or Mr. O'Brien until the fall of 2018.

**B.      Insignia Attempts to Restart Negotiations to Restructure the Note**

78.     Over the next sixteen months, Insignia focused on re-building its business, building management and service/solution delivery teams, developing its vendor and client relations, and strengthening its finances.  By October 2018, Insignia had a sufficient backlog of work and cash on hand to make a meaningful pay down (subject to a reasonable restructuring of the Note).

79.     In the fall of 2018, Insignia contacted Mr. La Clair to re-start negotiations.  Insignia provided Mr. La Clair with numerous income statements, balance sheets, and other confidential financial information, including information on Insignia's contract backlog to allow Mr. La Clair to gain a full understanding of Insignia's (still balance sheet insolvent) financial position.

80.     Between December 2018 and January 2019, Mr. La Clair and Mr. O'Brien exchanged term sheets and communications regarding a restructuring of the Note.  Mr. La Clair, however, continued to demand non-negotiable terms that were unacceptable for multiple reasons, including (but not limited to), the likelihood that the VA would determine Insignia was under the control of a non-service-disabled veteran, which would jeopardize all of the Company's current and future work.

81.     For example, Mr. La Clair demanded a lien on all of Insignia's assets and 100% of Mr. O'Brien's membership interests in the Company.  In addition, Mr. La Clair also demanded (in addition to full repayment of the Note) an "equity kicker" that would entitle Mr. La Clair to 20% of net proceeds upon a major capital or liquidity event, which would include a refinancing, sale of assets, and a whole or partial sale of Insignia's membership interests.  Considering Mr. La Clair's history (or indeed, even without any history), an all-assets, all equity lien by a creditor, (1) with as large of a claim as the Note and (2) who stood to reap 20% of the proceeds on essentially any

capital event, would almost certainly result in a presumption of non-service-disabled-veteran control by Mr. La Clair because Mr. O'Brien and Insignia would be unable to "exercise independent business judgment without great economic risk."  13 CFR part 125.13(i)(7).

### C.    Mr. La Clair Initiates Litigation to Gain Control of Insignia

82.    In an effort to turn up the heat on his LBO-to-own program, Mr. La Clair filed the La Clair Complaint against Insignia and Mr. O'Brien in the United States District Court for the Eastern District of Virginia on January 15, 2019.  In the La Clair Complaint, Mr. La Clair feigns ignorance of the Company's insolvency since April 2015 (and obfuscates its cause), and instead tries to use the Company's insolvency (which Mr. La Clair caused and Mr. O'Brien has reduced each year) as a sword, including to: (1) assert breach of contract claims against Insignia for its alleged breach of the Note and Mr. O'Brien for his alleged breach of the Pledge and (2) seek injunctive relief based on false assertions that "distributions" made to (a) state and federal taxing authorities on account of Insignia's tax obligations and (b) Mr. O'Brien for his compensation are unlawful.[27]

83.    And, consistent with his LBO-to-own strategy, Mr. La Clair sought the appointment of a receiver on the same baseless factual and legal assertions concerning Insignia's tax payments and compensation paid to Mr. O'Brien; as well as the same legally-defective argument that he made for foreclosure (*i.e.*, the incorrect assertion that Mr. O'Brien's membership interests can be

---

[27] To the contrary, payments to state and federal taxing authorities for a company's tax obligations are not included in the definition of "distributions" in the Virginia Limited Liability Company Act (the "LLC Act").  *See* Va. Code § 13.1-1002.  Even assuming *arguendo* that payments to state and federal taxing authorities were distributions under the LLC Act, Mr. La Clair is estopped from asserting otherwise because such payment is an affirmative covenant of Insignia under the Note.  *See* Note at Ex. A.  Finally, the LLC Act does not prohibit limited liability companies from making "distributions" for "amounts constituting reasonable compensation for present or past services."  Va. Code § 13.1-1035(E).

alienated under Virginia law).  In short, the La Clair Complaint is simply one more step in Mr. La

Clair's LBO-to-own program (where he threatens taking over ownership (recognizing he cannot),

with the hopes that he can wrestle complete economic control over the Company (while at the

same time hoping that the VA does not catch wind and do something about it)).

84.     But, Mr. La Clair's efforts to seize economic control of Insignia did not stop there.

On February 20, 2019, Mr. La Clair's counsel sent a letter (the "February 20 Letter") to Insignia's

counsel.  A copy of the February 20 Letter is attached hereto as **Exhibit I**.  In the February 20

Letter, Mr. La Clair's counsel asserted that, due to Insignia's alleged default of the Note, Mr. La

Clair has "the sole and exclusive right to exercise all voting, consensual and other powers of

ownership" in 49% of Mr. O'Brien's membership interest, including the power to bring a

derivative action in the name of the company pursuant to Virginia Code section 13.1-1043.  Mr.

La Clair's counsel then exercised Mr. La Clair's purported "powers of ownership" by demanding

that Insignia file a complaint against Mr. O'Brien to recover all distributions allegedly made in

violation of Va. Code §13.1-1035 and for breach of fiduciary duty.  The Company chose, instead,

to file this Complaint.

### D.     Mr. La Clair's Cleverly Insidious Attempt to Take Over or Destroy Insignia

85.     On February 19, 2019, Insignia filed a notice in the Litigation candidly advising

the District Court and Mr. La Clair of Insignia's imminent chapter 11 filing.  Perhaps fearful that

his years-long free ride on Insignia's and Mr. O'Brien's labors was coming to an end, Mr. La Clair

unleashed an insidious attempt to usurp control of Insignia from Mr. O'Brien.  On February 28,

2019, Mr. La Clair's counsel sent a letter to Mr. O'Brien's counsel (copied to Insignia's counsel)

(the "February 28 Letter") that included a "Written Consent" by which Mr. La Clair purported to

exercise a power of attorney granted in the Pledge to unilaterally modify Insignia's operating

agreement to prevent the Company from filing its chapter 11 petition without Mr. La Clair's consent.  A copy of the February 28 Letter is attached hereto as **Exhibit J**.

86.     The purported modification to Insignia's operating agreement was legally ineffective and void for several reasons.  For example, the act of modifying the operating agreement was outside the scope of the power of attorney granted in the Pledge.[28] In addition, contractual restrictions on an entity's ability to seek bankruptcy protection are void as a matter of public policy—especially "*cleverly insidious*" restrictions inserted by a lender without the express consent of the members.  *See In re Bay Club Partners-472, LLC*, No. BR 14-30394-RLD11, 2014 WL 1796688, at *5 (Bankr. D. Or. May 6, 2014) (finding that a pre-petition bankruptcy waiver inserted into an LLC operating agreement without discussion of the members was unenforceable). There are additional reasons that the purported modifications were ineffective, which will be raised with the Court at the appropriate time.

E.      **Insignia Files Its Chapter 11 Case**

87.     Mr. La Clair's persistent and methodical LBO-to-own program forced the Company to file this chapter 11 case to protect its trade creditors, employees, and the integrity of its business, including its ability to continue as a going concern, and the integrity of the SDVOSB and Vets First programs.  Insignia will prosecute its chapter 11 case as expeditiously as possible and intends to promptly file a plan of reorganization and associated disclosure statement that will return the Company to solvency, among other things.

---

[28] Mr. La Clair also likely violated the fiduciary duties that he owed to Mr. O'Brien as his purported attorney-in-fact.  *See* Va. Code Sec. 64.2-1612.A ("Notwithstanding provisions in the power of attorney, an agent that has accepted appointment shall: 1. Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest; 2. Act in good faith; and 3. Act only within the scope of authority granted in the power of attorney.").

88.     Insignia initiates this adversary proceeding to centralize and streamline certain disputes with Mr. La Clair, the resolution of which will prevent Mr. La Clair from succeeding on his LBO-to-own program to the detriment of Insignia's estate, trade creditors, and Mr. O'Brien.

**FIRST CAUSE OF ACTION**
(Objection to the Note Claim Asserted by Mr. La Clair Pursuant to 11 U.S.C. § 502(b)(1))

89.     Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

90.     Bankruptcy Code section 502(b)(1) allows a debtor to object to a claim and authorizes the Court to "determine the amount of [a] claim . . . as of the date of the filing of the petition, and [] allow [the] claim . . . except to the extent that— (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ." 11 U.S.C. § 502(b)(1).

**Count 1.A.**

91.     The LLC Act prohibits limited liability companies from issuing distributions if: (1) the distribution renders the company unable to pay its debts as they become due in the ordinary course of business; or (2) the limited liability company's total assets would be less than the sum of its total liabilities.  Va. Code § 13.1-1035(A).

92.     The LLC Act defines a "distribution" as "a direct or indirect transfer of money or other property, or incurrence of indebtedness by a limited liability company, to or for the benefit of its members in respect of their interests." Va. Code § 13.1-1002.

93.     Insignia's issuance of the $13.88 million Note to Mr. La Clair (the "Note Distribution") as part of the La Clair LBO on April 3, 2015 was an incurrence of indebtedness by Insignia to or for the benefit of its member, Mr. La Clair, in respect of his interests, and, as such, was (and must be treated as) a "distribution" under the LLC Act.  Through the vehicle of the

Pledge, Mr. La Clair found a way to hold on to his equity, not even reducing the 49% he held commensurate with the nearly $17 million effective cash distribution paid to him by the Company. At best this was a disguised equity distribution.

94.     The Note Distribution occurred upon execution on April 3, 2015.  Accordingly, the effect of the Note is measured as of April 3, 2015.  Va. Code § 13.1-1035-(C).  As of April 3, 2015, due to the incurrence of indebtedness pursuant to the La Clair LBO, Insignia's assets were less than the sum of its total liabilities and Insignia was prohibited from issuing the Note pursuant to LLC Act section 13.1-1035(A).  Therefore, the Note was issued to Mr. La Clair in violation of LLC Act section 13.1-1035(A).

95.     Virginia law has long held that contracts made in violation of the law are unenforceable.  *Clark v. Moore*, 196 Va. 878, 881–82 (Va. 1955) ("'The law refuses to enforce illegal contracts, as a rule, not out of regard for the party objecting, nor for any wish to protect his interests, but from reasons of public policy. Whenever, therefore, the illegality of the contract appears, whether alleged in the pleadings or made known for the first time in the evidence, it is fatal to the case. * * * The law will not enforce contracts founded in its violation.'" (quoting *Massie v. Dudley*, 173 Va. 42, 52 (Va. 1939))); *see also Miller v. Ammon*, 145 U.S. 421, 426 (1892) ("The general rule of law is that a contract made in violation of a statute is void, and that, when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover."); *Boggs v. Fleming*, 66 F.2d 859, 860 (4th Cir. 1933) (affirming the disallowance of a claim by the debtor's former president for the purchase of his stock after concluding that the agreement "did not improve the company's financial condition, and, in our opinion, completed the insolvency of the company if it were not already insolvent.").

35

96.    The Note was made in violation of section 13.1-1035(A) of the LLC Act and,

therefore, is void.  *Miller v. Ammon*, 145 U.S. at 426.  Mr. La Clair cannot establish any cause of

action against Insignia without relying on the Note.  Accordingly, Mr. La Clair cannot recover or

assert an allowable claim on account of the Note.

97.    For the foregoing reasons, Mr. La Clair's claim should be disallowed in its entirety

pursuant to Bankruptcy Code section 502(b)(1).

**Count 1.B.**

98.    In addition, any claim on the Note is unenforceable under general principles of

equity due to Mr. La Clair's conduct in rendering Insignia insolvent.  When a contract is "against

public policy, or illegal, still, where the parties to it are not *in pari delicto*, and where public policy

is considered as advanced by allowing either, or at least the most excusable of the two, to sue for

relief, relief may be given to him, either against the transaction by setting it aside and restoring

him to his original position."  *Waller v. Eanes' Adm'r*, 156 Va. 389, 396 (Va. 1931) (quotations

omitted).

99.    At all relevant times prior to the execution of the Note, Mr. La Clair was Insignia's

president and had full knowledge of its finances.  Mr. La Clair was under a duty to act in the best

interests of Insignia.  Va. Code § 13.1-1024.1(A).[29]  Notwithstanding this knowledge and in

violation of his duty, Mr. La Clair conditioned the redemption of his membership interests in

Insignia on the Company (1) distributing and depleting its capital to such an extent that Mr.

---

[29] As Insignia's president in the lead-up to the execution of the Note, Mr. La Clair is deemed a "manager" of Insignia for purposes of section 13.1-1024.1.  Va. Code § 13.1-1024.1(D) ("For the purposes of this section only, the term "manager" shall be deemed to include any member that is participating in the management of the limited liability company.").

O'Brien was required to immediately contribute $3.5 million to re-capitalize the Company and (2) incurring $22.88 million in indebtedness ($9 million bank loan and $13.88 million Note).

100.    Mr. La Clair violated his duty to Insignia by conditioning his departure on the Company making distributions that depleted the Company's capital and causing it to incur debt that rendered it insolvent in violation of section 13.1-1035(A) of the LLC Act.  None of these actions improved Insignia's financial condition; instead they were the immediate cause of Insignia's insolvency.  Although Insignia issued the Note in violation of LLC Act section 13.1-1035(A), it has received no benefit from the La Clair LBO and has been substantially harmed by Mr. La Clair's actions, which have ultimately caused its bankruptcy.  Considering that Mr. La Clair has already gained $16,850,339 from the La Clair LBO, public policy would be advanced for Insignia (the more excusable of the two) to be relieved of its obligations under the Note.

101.    For the foregoing reasons, Mr. La Clair's claim should be disallowed in its entirety pursuant to Bankruptcy Code section 502(b)(1).

## SECOND CAUSE OF ACTION
(Recharacterization of the Note Pursuant to 11 U.S.C. § 105(a))

102.    Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

103.    In the alternative, to the extent that the Court declines to disallow Mr. La Clair's claim, Insignia submits that Mr. La Clair's claim should be recharacterized pursuant to Bankruptcy Code section 105(a).

104.    Bankruptcy Code section 105(a) allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

105.    The United States Court of Appeals for the Fourth Circuit has concluded that "recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a)." *In re: Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006).

106.    In deciding whether to recharacterize a claim, courts should consider the following non-dispositive factors, all of which speak to whether the transaction appears to reflect the characteristics of an arm's-length negotiation:

    a.  the names given to the instruments, if any, evidencing the indebtedness;

    b.  the presence or absence of a fixed maturity date and schedule of payments;

    c.  the presence or absence of a fixed rate of interest and interest payments;

    d.  the source of repayments;

    e.  the adequacy or inadequacy of capitalization;

    f.  the identity of interest between the creditor and the stockholder;

    g.  the security, if any, for the advances;

    h.  the corporation's ability to obtain financing from outside lending institutions;

    i.  the extent to which the advances were subordinated to the claims of outside creditors;

    j.  the extent to which the advances were used to acquire capital assets; and

    k.  the presence or absence of a sinking fund to provide repayments.

*In re: Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 233-34.

107.    The following *Dornier* factors support the recharacterization of Mr. La Clair's debt as equity in Insignia:

    a.  Mr. La Clair is an insider of the Company and was so when the Note was executed.

    b.  By virtue of his insider status and knowledge (including knowledge that he intentionally drove the Company into insolvency), Mr. La Clair was aware of the significant likelihood that Insignia would be unable to pay on the Note.

    c.   Mr. La Clair's knowledge of Insignia's likely inability to pay is evidenced by a number of things, including: (i) the $12.5 million up-front payment provided to Mr. La Clair in the Redemption Agreement; (ii) the Note expressly providing for a reduction of its principal based on Insignia's 2016 revenues; (iii) the Note's security provided by the Pledge effectively rendering the Note a convertible security; (iv) the simultaneous distribution of $4.4 million to Mr. La Clair; and (v) the resulting insolvency of the Company.

    d.   Insignia was inadequately capitalized when the Note was issued.

    e.   Insignia was insolvent when the Note was issued.

    f.   The Note was subordinated to Bank of America's loans.

    g.   The Note was not secured by any Insignia property.

    h.   The Note does not provide for a sinking fund to provide repayments.

108.    In addition, no third-party lender would have accepted $11.88 million in paper from the Company under the same circumstances that Mr. La Clair did (unless, perhaps, it was free, as it was for Mr. La Clair), as evidenced by Bank of America's unwillingness to loan any more than $9 million to the Company.

109.    For all of the foregoing reasons, the Court should recharacterize Mr. La Clair's claim as equity.

### THIRD CAUSE OF ACTION
(Mandatory Subordination Pursuant to 11 U.S.C. § 510(b))

110.    Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

111.    In the alternative, to the extent the Court declines to disallow Mr. La Clair's claim or if the Court finds that recharacterization does not apply, Insignia submits that Mr. La Clair's claim should be subordinated pursuant to Bankruptcy Code section 510(b).

112.    Bankruptcy Code section 510(b) provides:

For the purpose of distribution under this title, **a claim arising from** rescission of **a purchase or sale of a security of the debtor** or of

an affiliate of the debtor, **for damages arising from the purchase or sale of such a security**, or for reimbursement or contribution allowed under section 502 on account of such a claim, **shall be subordinated to all claims** or interests **that are** senior to or **equal the claim** or interest **represented by such security**, **except that if such security is common stock, such claim has the same priority as common stock**.

11 U.S.C. § 510(b) (emphasis supplied).

113.    If the securities are the membership interests of a limited liability company, the holder of the claim has the same priority as current holders of the limited liability company's membership interests. *See id.* (membership interests in a limited liability company are the equivalent to common stock in a corporation).

114.    Mr. La Clair's claim arises from the sale of his membership interests to Insignia, and therefore Section 510(b) applies.

115.    Mr. La Clair's claim is subject to mandatory subordination under Bankruptcy Code section 510(b), and therefore must be subordinated to Insignia's general unsecured creditors and (absent further subordination) hold the same priority as Mr. O'Brien's membership interests.

### FOURTH CAUSE OF ACTION
(Equitable Subordination Pursuant to 11 U.S.C. § 510(c))

116.    Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

117.    In the alternative, to the extent the Court declines to disallow Mr. La Clair's claim and if the Court grants Count 2 (and recharacterizes Mr. La Clair's claim as equity) or finds that section 510(b) does not apply, then Insignia submits that Mr. La Clair's claim should be subordinated pursuant to Bankruptcy Code section 510(c).

118.    Bankruptcy Code section 510(c) provides, in relevant part, that "after notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes

of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c).

119.    On or about April 3, 2015, Mr. La Clair served as Insignia's president and had full access to Insignia's books and records, including contract backlogs and financial data.

120.    Mr. La Clair used this knowledge in an inequitable manner by requiring Insignia to distribute approximately $8.9 million in cash outside of the ordinary course of business, of which approximately $4.36 million was directly distributed to Mr. La Clair.  Mr. La Clair's demands depleted Insignia's capital to such an extent that Mr. O'Brien was required to contribute $3.5 million (out of his approximate $4.54 million share of the distribution) immediately back to Insignia, to be distributed to Mr. La Clair.

121.    Mr. La Clair also demanded that Insignia execute the $13.88 million Note, knowing that Insignia would be rendered insolvent by the transaction.

122.    In addition to $12.5 million in cash, the Note was issued solely to redeem Mr. La Clair's membership interests in Insignia and not for any goods or services provided by Mr. La Clair or on account of any cash capital contributions by Mr. La Clair to Insignia.

123.    The Note is not secured by any of Insignia's property, but rather by a lien on Mr. O'Brien's membership interests in Insignia.

124.    Notwithstanding the fact that the Note is not secured by any Insignia property, Mr. La Clair has asserted that he in a secured creditor of Insignia.  *See, e.g.*, La Clair Complaint at ¶ 68.

125.    Separately, Mr. La Clair has attempted to leverage the pledge of Mr. O'Brien's membership interests in Insignia to either squeeze more money out of the Company or ensure its

demise to the detriment of Mr. O'Brien, employees, creditors and counter-contract parties, including the U.S. Government.

126.    As set forth above, Mr. La Clair engaged in inequitable conduct (including noticing and threatening the sale of "all right title and interest" in Mr. O'Brien's membership interests in Insignia, while knowing Virginia law does not permit this), resulting in injury to creditors or conferring an unfair advantage on Mr. La Clair.

127.    Mr. La Clair and the La Clair LBO are responsible for the Company's continuous insolvency since April 2015.  The Company is insolvent today only because of Mr. La Clair and his actions.

128.    Equitable subordination of Mr. La Clair's claim to other claims (or his equity to Mr. O'Brien's) is consistent with the Bankruptcy Code.

### FIFTH CAUSE OF ACTION
(Designation Pursuant to 11 U.S.C. § 1126(e))

129.    Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

130.    If the Court declines to disallow Mr. La Clair's claim in its entirety, Insignia submits that La Clair's claim should be designated pursuant to Bankruptcy Code section 1126(e).

131.    Bankruptcy Code section 1126(e) provides, in relevant part, that "the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."  11 U.S.C. § 1126(e).

132.    The Fourth Circuit has noted that although a "creditor is expected to cast his vote in accordance with his perception of his own self-interest, [] he may not act with an ulterior or coercive purpose." *In re Fed. Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988).  Not acting in good

42

faith includes acting "with a purpose of coercing payment to him of more than he might reasonably perceive as his fair share of the debtor's estate," or for an ulterior purpose, such as "pure malice," "blackmail," or "to destroy an enterprise in order to advance the interests of a competing business." *Id.*

133.    Mr. La Clair's actions satisfy each of these independent grounds.  He knowingly and intentionally rendered the Company insolvent and unable to satisfy its obligations absent infusions from Mr. O'Brien and third-party financing.   And since that time has consistently pursued a plan of coercion (accurately characterized as "blackmail," to use the court's term) aimed at coercing the Company and Mr. O'Brien to pay him more than anyone would reasonably perceiver as a fair share of the Company (and now its estate).  He threatened to sell "all right title and interest" to Mr. O'Brien's llc interests when he knew this was prohibited by Virginia law; all to bully Mr. O'Brien into paying more, sooner.  Recently in the Litigation, he has (a) feigned ignorance of the Company's insolvency since 2015 (which he caused) to request relief from the District Court based upon the Company's insolvency, while at the same time (b) ratcheting up the pressure on the Company, adding equity kickers and the like to his lengthy list of demands.  Most recently, Mr. La Clair has demanded that Insignia take legal action against Mr. O'Brien and attempted to prevent Insignia from exercising its right to seek bankruptcy protection.  Mr. La Clair has consistently engaged in this anaconda-like pattern of behavior aimed at controlling debts, assets, and equity of the Company, knowing full well that this would (at best) jeopardize the Company's vet-qualified status, and perhaps lead to de-certification and the demise of the business. Mr. La Clair's actions and claim (all flowing from the La Clair LBO) are the sole cause of the Company's insolvency today.  In short, Mr. La Clair's actions demonstrate that he wants more

than the "fair share" and that otherwise, whether out of "pure-malice" or otherwise, he is prepared to "blackmail" to accomplish his goals or even "destroy [the] enterprise."

134.    Based on the facts as alleged, Mr. La Clair's claim should be designated pursuant to Bankruptcy Code section 1126(e).

## SIXTH CAUSE OF ACTION
(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and 11 U.S.C. § 101(31))

135.    Insignia repeats and re-alleges the allegations of the foregoing paragraphs of this Complaint as if set forth fully herein.

136.    Bankruptcy Code section 101(31)(B) sets forth a non-exclusive list "insider[s]," including the following (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor (collectively, the "Statutory Insiders").

137.    In addition, Bankruptcy Code section 101(31)(E) provides that an "affiliate" is also an "insider." An "affiliate" is defined as an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote." 11 U.S.C. § 101(2)(A).

138.    Although the Bankruptcy Code does not expressly include former Statutory Insiders, case law and other sections of the Bankruptcy Code suggest that former Statutory Insiders are insiders when, as here, the transaction at issue or giving rise to the claim occurred when the party was a Statutory Insider. *See, e.g.*, 11 U.S.C. § 547(b)(4)(B) ("if such creditor as the time of such transfer was an insider").

139.    An insider is a party with a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor. *See In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1323 n. 3 (4th Cir. 1991); *see also In re Adam Aircraft Indus., Inc.*, 805 F.3d 888, 894 (10th Cir. 2015) (same); *In re S. Beach Sec., Inc.*, 606 F.3d 366, 377 (7th Cir. 2010) (same); *In re Winstar Communications, Inc.,* 554 F.3d 382, 396–97 (3d Cir. 2009) (same).

140.    At all times during the Company's history as a limited liability company, including the present, Mr. La Clair has been (and is) a partner (at least for tax purposes) in the Company. The Court should find him to be an insider on this basis alone.

141.    Mr. La Clair was an insider under any definition at the time of the La Clair LBO. His claim arises from the La Clair LBO, and there is no logical basis (particularly considering his efforts after the La Clair LBO to control the Company from every angle other than perhaps operationally), to allow him to shed his insider status. *Cf.* 11 U.S.C. § 547(b)(4)(B) (courts evaluate insider status at the time of the transaction for purposes of deciding whether to set it aside).

142.    From the time of the La Clair LBO until his feigned attempt to "foreclose" on Mr. O'Brien's interests, Mr. La Clair periodically received non-public Company financials; documents and information available only to insiders.  While this information sharing was temporarily suspended given Mr. La Clair's aggressive behavior against Mr. O'Brien, it resumed in the last quarter of 2018.

143.    Furthermore, given that Mr. La Clair asserted in the February 20 Letter that he has "the sole and exclusive right to exercise all voting, consensual and other powers of ownership" (February 20 Letter at p. 1) pertaining to 49% of Mr. O'Brien's membership interests and exercised

those rights by demanding that Insignia bring an action against Mr. O'Brien, Mr. La Clair concedes

he is an "affiliate" under Bankruptcy Code section 101(2)(A).  And any remaining doubt regarding

Mr. La Clair's status as an "affiliate" ended with his actions on February 28, 2019 notwithstanding

their ineffectiveness.  For these reasons, Mr. La Clair is an "insider" pursuant to Bankruptcy Code

section 101(31)(E) (if not a Statutory Insider).

144.     Mr. La Clair will, no doubt, contend that he was able to fully shed his insider status

from and after the La Clair LBO.  If not, and he concedes he is an insider, then this Count can be

withdrawn or dismissed as appropriate.

145.     Otherwise, an actual, substantial, continuing and justiciable controversy exists

between Insignia and Mr. La Clair regarding Mr. La Clair's insider status.  Given the actual

controversy between the parties, a judicial determination is necessary and appropriate under 28

U.S.C. § 2201.

146.     To resolve this controversy, Insignia requests that, pursuant to 28 U.S.C. § 2201,

this Court declare whether Mr. La Clair is an insider.  Given the facts, including that Mr. La Clair:

(a) is the Company's founder, (b) served as its CEO until the La Clair LBO he orchestrated (which

drove the Company into insolvency), (c) has continued and remains as a partner for tax purposes,

(d) has received non-public financial reporting available only to insiders, and (e) has attempted to

control the Company through debt, equity and otherwise, he enjoys a sufficiently close relationship

with the Company that makes his conduct subject to closer scrutiny than those dealing at arm's

length with the Company.  As such, the Court should declare that Mr. La Clair is an insider of the

Company as defined in Bankruptcy Code section 101(31) for all purposes in Insignia's chapter 11

case.

**PRAYER FOR RELIEF**

WHEREFORE, Insignia respectfully prays for relief and judgment as follows:

(a)    Entry of an order disallowing Mr. La Clair's claim in its entirety pursuant to Bankruptcy Code section 502(b)(1).

(b)    To the extent Mr. La Clair's claim is not disallowed in Count 1, entry of an order recharacterizing Mr. La Clair's claim as equity (Count 2) and subordinating said equity to that of Mr. O'Brien's (Count 4).

(c)    To the extent Mr. La Clair's claim is not disallowed in Count 1, if the Court neither recharacterizes (Count 2) Mr. La Clair's claim nor subordinates him to Mr. O'Brien (Count 4), entry of an order (i) subordinating the claim to those of Insignia's general unsecured creditors and (ii) giving it the same priority as the Mr. O'Brien's equity interests pursuant to Bankruptcy Code section 510(b).

(d)    To the extent Mr. La Clair's claim is not disallowed in Count 1, if the Court neither recharacterizes Mr. La Clair's claim nor subordinates him to Mr. O'Brien (Count 4), entry of an order (i) subordinating the claim to those of Insignia's general unsecured creditors and (ii) giving it the same priority as the Mr. O'Brien's equity interests pursuant to Bankruptcy Code section 510(c).

(e)    To the extent Mr. La Clair's claim is not disallowed in Count 1, entry of an order designating Mr. La Clair and his claim pursuant to Bankruptcy Code section 1126(e).

(f)    Entry of an order providing that Mr. La Clair is an insider as defined in Bankruptcy Code section 101(31) for all purposes in Insignia's chapter 11 case.

(g)    Granting any such other and further relief as the Court deems just and proper.

Dated:  March 2, 2019                              Respectfully submitted,

                                                  PILLSBURY WINTHROP SHAW PITTMAN LLP

                                                  By:    /s/ Patrick J. Potter
                                                         Patrick J. Potter, VSB No. 37966
                                                         Pillsbury Winthrop Shaw Pittman LLP
                                                         1200 Seventeenth Street, NW
                                                         Washington, DC 20036
                                                         Tel (202) 663-8928
                                                         Email: patrick.potter@pillsburylaw.com

                                                         Jason S. Sharp, *pro hac vice* admission pending
                                                         Pillsbury Winthrop Shaw Pittman LLP
                                                         2 Houston Center
                                                         909 Fannin, Suite 2000
                                                         Houston, TX 77010-1028
                                                         Tel (713) 276-7600
                                                         Email: jason.sharp@pillsburylaw.com

                                                         Andrew A. Alfano, *pro hac vice* admission
                                                         pending
                                                         Pillsbury Winthrop Shaw Pittman LLP
                                                         1540 Broadway
                                                         New York, NY 10036
                                                         Tel (212) 858-1000
                                                         Email. andrew.alfano@pillsburylaw.com

                                                         *Proposed Counsel for the Debtor and
                                                         Debtor in Possession*